**W. BERBERICH, Rod Tiemann, A. J. Gubser, George Stocker, G. C. Biesinger, Nelson H. Buss, and William Hennerich, Plaintiffs-Appellants,**

v.

**CONCORDIA GYMNASTIC SOCIETY, Defendant-Respondent,**

**City of Saint Louis, Intervenor-Respondent.**

**No. 32272.**

St. Louis Court of Appeals.

Missouri.

April 19, 1966.

Herman M. Katcher, Walter S. Berkman, St. Louis, for appellant.

Stemmler & Stemmler, St. Louis, for defendant-respondent.

Thomas F. McGuire, City Counselor, Thomas J. Neenan, John J. Fitzgibbon, Associate City Counselors, St. Louis, for intervenor-respondent.

TOWNSEND, Commissioner.

This is an action for a declaratory judgment seeking a declaration as to the rights and duties of the parties with respect to certain real estate acquired by defendant in 1961 and for an injunction restraining defendant from the use of that real estate in alleged violation of the Zoning Ordinances of the City of St. Louis. The city has intervened. From an adverse judgment, plaintiffs appeal.

Plaintiffs charge that the allegedly unauthorized and illegal use of defendant's property is continuous and recurrent, that the damage to plaintiffs flowing therefrom is irreparable, that plaintiffs will suffer further deterioration in the value of the property of each unless such use is enjoined, that the damage is not susceptible of precise determination, and that plaintiffs are without adequate remedies at law. Defendant denies any violation of the ordinances and on the contrary maintains that present and contemplated uses of the property in question are specifically permitted thereunder. Defendant also denies that either its present or intended use of that property has caused or will cause plaintiffs to suffer any damages or deterioration of their property whatsoever.

Defendant has filed a motion to dismiss the appeal on the ground that the questions presented have become moot. We find otherwise and deny the motion.

Defendant's tract lies in part in "F" zoning district (commercial) and in part in "A" district (single-family dwelling). The westerly or F part of the tract faces on Gravois Avenue and is occupied in part by defendant's buildings, housing dining rooms, bar, handball court and gymnasium. The A part of the tract lies in general back of such buildings and hence is in the easterly part of defendant's real estate. Maps introduced by the parties indicate that the defendant's real estate has a depth from Gravois Avenue of approximately 350 feet and that the F portion of the tract is approximately 125 feet in depth. Plaintiffs are the owners of single-family dwellings on lots contiguous with or in the immediate vicinity of Part A.

The relevant zoning ordinance of the City of St. Louis was adopted in 1950 (Ord. 45309). The pertinent parts are

found in Chapters 904 and 903 of the city code and are as follows:

## "904 'A' SINGLE-FAMILY DWELLING DISTRICT

904.010 *District Regulations.*—The regulations set forth in this Chapter or set forth elsewhere in the zoning code when referred to in this Chapter are the district regulations in the 'A' Single-Family Dwelling District.

904.020. *Use Regulations.*—A building or premises shall be used only for the following purposes:

(1) Single-Family Dwellings.

\* \* \*

(5) Churches.

(6) Schools offering not less than two years of complete courses of instruction equivalent to those given in public primary, secondary and high schools or state universities.

\* \* \*

(9) Publicly owned museums, art galleries, parks and playgrounds, and libraries; and privately owned parks and playgrounds wherein no service is rendered, or activity conducted, as a business.[1]

(10) Accessory building and uses customarily incidental to any of the above uses \* \* \*

\* \* \*"

Section 903.010 of the Code provides: "*Uses Prohibited.*—No building or land shall be used for a use other than those permitted in the district in which such premises are located unless \* \* \* (b) such use existed prior to the effective date of this ordinance."[2] The ordinance was approved April 25, 1950.

◼ We note that the parties have stipulated that a Certificate of Occupancy was issued by the city's Department of Public Safety, Division of Building and Inspection, on June 8, 1962, and that it certifies that the property at 6432 Gravois is in the "F. and A. Zoning District and may be used for Private Park and Playground, which usage is permissible in the F. and A. Zoning District in accordance with the provisions of Ordinance 45309 as amended." This certificate is of no moment in the present case since, insofar as the real estate here in controversy is concerned, it simply recites the terms of the ordinance and so aids in determining nothing. And see Evans v. Roth, 356 Mo. 237, 201 S.W. 2d 357.

Defendant put into evidence a plat showing proposed developments in the A area including swimming pool, parking area, children's area with a wading pool, a horseshoe pitching plot, fences and shrubbery. At the rear of the lot the plat shows an area designated as "Outdoor Activities (Running, Shot Put, etc.)". The latter area runs across almost the full width of the tract and ends at one corner with "Sand Pit for Jumping". The north side of the proposed parking area to its full length and a small part of the "Outdoor Activities" area are those portions of the A area that lie nearest to the residences of plaintiffs. Defendant's president testified concerning the various intended uses. About one and one-half acres lie within the A zoned area; approximately two-thirds of such A part is to be available as a parking lot. He suggested the possibility that the paved part of such two-thirds would be used for variant purposes—handball courts, tennis courts, barbecues and picnicking, and square dances—"by any part of our program that it would be best suited for".

1. That part of this sub-section relating to privately owned parks and playgrounds was enacted in 1957.

2. By Ord. 50547, approved April 21, 1961, the (b) exception reads: "prior to May 25, 1950".

By the evidence and the arguments, pro and con, emphasis has been placed principally upon the matter of building and operating a swimming pool.

We proceed to consider the following numbered specifications of violations alleged by plaintiffs in their petition:

■ (1) That defendant "has permitted, and will permit, large assemblies of persons for playground and picnics in said area designated as Zoned 'A' single family dwelling". The record is barren of any evidence relating to the size of the groups which assemble on part A for playground purposes. Nor could such size seem to be material if part A is being utilized for one of the purposes specifically comprehended within "A" Single-Family Dwelling District, namely, use as a privately owned park and playground. As far as use as a park and playground simpliciter are concerned there is nothing to indicate that service is rendered or an activity conducted in connection therewith as a business. As for picnics, we have no difficulty in recognizing picnicking as an "accessory use customarily incidental" to the use of a park and playground. The habits and customs of our fellow citizens are not so unknown to us as to leave us in any doubts on that score. We find no ordinance violation under this head.

■ (2) That defendant "plans to, and proposes to, use its said property for the purpose of constructing a swimming pool and cabanna area in an area Zoned 'A' single family dwelling, to be available to restricted public membership". Does the construction and operation of a swimming pool fall outside the scope of use of the premises as a park and playground? To this question plaintiffs have vigorously devoted a large part of their argument. We disagree with their contentions. It needs no buttressing by the citation of precedents to say that parks and playgrounds are generally conceived to be areas devoted to recreation and in this day and age it would be a little late to embrace the concept of a park and playground as necessarily excluding facilities for physical exercise, for recreational sports and for competitive games. There can be no doubt that swimming is a healthful and popular form of recreation and relaxation. The presence of swimming pools in parks and playgrounds is a matter of such common knowledge that the practice of so installing and maintaining them cannot be ignored.

Counsel have presented no precedents in this respect relating to private parks and playgrounds and investigation has brought none to our attention. However Section 904.020 includes publicly owned parks and playgrounds in the same subsection (9) with privately owned parks and playgrounds and, while it would be pure dictum to say that the criteria for determining the permissive uses of one are always the same as for the other, the juxtaposition of the two terms in the same subsection justifies an examination of some of the available precedents relating to permissive uses of public parks and playgrounds.

In Bailey v. City of Topeka, 97 Kan. 327, 154 P. 1014, L.R.A.1916D, 491, there was a private gift of land to the City to be used as a public park "for the benefit of the health, comfort and recreation of the citizens * * *." The Court said: "Clearly it is not inconsistent with the conditions imposed by the donor of the property that visitors to the park should be afforded facilities * * * for boating, and bathing * * * the facilities undertaken to be supplied are appropriate to the conduct of a public park."

"A public park is ground used for public recreation * * * swimming is a popular and healthful recreation, so we are of the opinion that a public swimming pool is within the definition of a public park and the City had charter power to operate such pool." Ashworth v. City of Clarksburg, 118 W.Va. 476, 190 S.E. 763.

"The swimming pool * * * was a feature of the park tending to promote public health, happiness, and welfare." Gilliland v. City of Topeka, 124 Kan. 726, 262 P. 493.

The Supreme Court of Colorado in an opinion put the question: "Is the installation of a swimming pool and bathhouse in a public park, for the use of the public, a park purpose? The answer is 'Yes'". McLauthlin v. City and County of Denver, 131 Colo. 222, 280 P.2d 1103.

In an action to enjoin the issuance of municipal bonds, the proceeds of which were to be used for the purpose of building a swimming pool in a public park, the Supreme Court of Kansas said: "Swimming is a universal recreation of the highest order * * * cities with propriety have parks with modern, sanitary pools to which its citizens may resort for the benefit of their health. Whatever encourages or induces the ordinary 'city shut-in' to seek exercise, relaxation, recreation, or healthful amusement is a means of redounding to the public welfare and should be approved." Smith v. Fuest, 125 Kan. 341, 263 P. 1069.

We find no violation of ordinance in the mere construction and operation of a swimming pool in part A.

The meaning in this specification of the words, "to be available to restricted public membership" is unclear. The president of defendant testified as to the various types of membership in the society. Use of its facilities is confined to members, their children and guests, except upon those occasions when the structures in part F are rented to outside parties. For a certain class of members—sustaining—a certain tuition charge is made when children of such members receive instruction in gymnastic classes and it is intended to follow the same practice when children of such members receive swimming or diving instruction at the pool. It seems somewhat inept to say then that the pool is to be available to restricted public membership. If the intended connotation of that phrase is that the pool is thereby to be made available to the general public we think there is no evidence to support such a charge.

(3) That the defendant "has permitted and will in the future permit, a large and substantial number of motor vehicles to be parked in an area zoned 'A' single family dwelling." Again it seems to us that in a modern setting the use of an area for automobile parking purposes is incidental to the basic uses of a park and playground as long as use by such parking is confined to those who are pursuing the activities contemplated within such basic uses. This again involves a matter of such common knowledge that it cannot be ignored. The universal use of the automobile and the undeniable practice of utilizing certain portions of a park and playground for the vehicular accommodation of those who come to accomplish the recreational purposes of such an area lead inevitably to the conclusion just stated.

■ On the other hand, the evidence establishes that the parking area within part A is utilized also by members of the defendant society who are not otherwise engaging in any activities within part A; members who come only to enjoy the use of the defendant's buildings in part F also park their cars in the parking area found in part A. When so doing, such use of the parking facilities within part A is not an "accessory use customarily incidental" to the permitted uses of part A as a park and playground within the terms of Chapter 904.

Moreover the evidence shows that the defendant rents out its buildings within the F zone for wedding receptions, banquets, dances and other affairs, particularly on weekends. The evidence well discloses that there is some parking in the parking area in part A by persons attending the affairs in part F, despite the efforts of defendant to provide parking for

such persons in the F area and in parking facilities located across Gravois Avenue. Use of the parking area in part A by such persons upon such occasions is obviously not a use permitted under any part of Chapter 904. In fact, such use of the parking area in part A is a use prohibited under Section 903.010 of the Code, unless saved by provisions of the Code hereinafter considered.

The evidence shows that in 1941 (and perhaps prior thereto) the whole tract of land herein involved was owned by the proprietors of an outdoor beer garden and restaurant known as the "Black Forest"; subsequently the tract was utilized by the proprietors of a restaurant known as the "Thunderbird". Testimony by one of defendant's witnesses was to the effect that in 1941 the outdoor beer garden extended into what is now a part of part A of the tract and that parking of cars was regularly permitted in the area now known as part A. Another witness for defendant testified as to his presence in the Black Forest in 1947. He recalls that at that time parking occurred "nearly to the back of the property". Witness visited the property three or four times during 1949. There was no evidence rebutting the testimony of these two defence witnesses.

The obvious purpose of eliciting the testimony of the last mentioned two witnesses was to establish a non-conforming use of part A of the tract before 1950. While both witnesses are members of the society, there was no attempt to impeach their testimony. Additionally one of the plaintiffs testified that in 1952 there was parking in part A—"a few cars, yes, on occasion".

The present use of the parking area in part A includes uses permitted by the Zoning Ordinance; it includes also uses which do not fall within the specified permissive uses of Chapter 904. However, the implication of Section 903.010 of the Code that a use which existed prior to April 25, 1950 is a permissive use is clear.

We proceed to consider plaintiffs' evidence as to past and present uses of the parking area in part A of the tract.

Plaintiffs' witnesses testified to the following effect: Mrs. Schneebeli stated that she and her husband moved to their adjacent property in 1956, that cars are parked in the area in question every night, that more cars are parked there every weekend. "Saturday night mostly", that in their first year of residence she noticed cars parked behind their property but not as many as now, that she never noticed whether Black Forest parking extended "on back", that at the times of receptions persons who park in the area are usually there after midnight and by their loud talk and other noise-making disturb and awaken witness' family. Mrs. Hennerich, whose residence in the neighborhood dates from 1954, testified that while Black Forest had the tract there was parking a few yards in from the back boundary of the tract ("A few yards in from your property? (A) Yes"), that "we had trouble with them too and we went down to see what the zoning was. * * * it was they allowed no parking whatever in there, and we would call and make them stop and if you'd call then they would stop for a while", that some would park back near the boundary "and we would report it, because when we had our house built we had it built with the understanding there was no parking in there, that was residential and they guaranteed that to us", that the latter understanding was "with City Hall, when we went there to see about the zoning." Mr. Berberich testified that in 1952 he moved to his present residence adjacent to the rear of the tract, that he visited the Black Forest prior to 1950, that he took part in its open air facilities, that in the A part there was parking by "a few cars, yes, on occasion", at the time that he moved to his property, that currently there is "Parking in the back and they get out late at night and use profane language and sing out there and we have to call the police, on numerous occasions we have

had to call the police to get them off the parking lot after whatever affair they had there closes", that there are some cars parked there every day and on weekend nights the lot is "filled or half filled" and that this has been going on ever since defendant started renting out the hall.

From the above summarized testimony of plaintiffs' witnesses, plaintiffs' brief makes the *finding* under Point II that whenever cars were parked in the A part before defendant's acquisition of the property, the adjoining residents made complaints and thereafter parking thereon was discontinued. The recited testimony will not support an inference of discontinuance. Neither appeals to the police nor protests to the former occupants of the tract resulted in the complete cessation of parking in the disputed area. Whether parking was intermittent, or sporadic as plaintiffs would characterize it, the net result was no complete relinquishment of the practice of parking in the A part. Even the testimony of Mr. Berberich, one of the plaintiffs, shows that the Black Forest continued in occupancy in 1952 and that there was parking in the area in that year. None of plaintiffs' witnesses had any relationship to that area before 1952 and if a non-conforming use was established before 1950 that use was not lost by infrequent parking; the privilege of using land for a non-conforming use is extinguished only by an abandonment for a period of ten years. Section 903.060.

Section 901.330 defines non-conforming use in these words: "Any building or land lawfully occupied by a use on May 25, 1950,[3] which is in conflict with the use regulations of the district in which it is situated." Plaintiffs' brief contends that the "occasional" parking of cars before April 25, 1950, on what is now part A

was unlawful because there is no evidence that prior owners had ever obtained permits or licenses to use the land for a parking lot. We choose to state the matter in a converse fashion and say that there is no evidence that such use prior to April 25, 1950 was unlawful and so presumptively such use was lawful. The reference to permits and licenses is irrelevant in the absence of some showing that the city had exercised its police power to require the same.

On the basis of all the evidence that is before us, we find that parking in the present and contemplated parking area of part A of the tract is a permitted use by virtue of Section 903.010 and hence constitutes no violation of the Ordinance.[4]

(4) That the defendant "has permitted, and will permit, motor vehicles to be parked in an area Zoned 'A' single family dwelling, without said area complying with the requirements of City Ordinance with respect to parking space."

There are no specifications of this complaint. If it is intended to connote some ordinance requirement of size of or materials for parking space, there is no reference thereto either in plaintiffs' brief or in their evidence. If the allegation is intended to assert generally a use of the parking area not conforming to the requirements of the ordinance that matter has already been considered.

Plaintiffs make the further charge that the defendant does not conduct a "school" as defined in the Ordinance. The president of the defendant testified that the society conducts a gymnastic school within the buildings situated on the F part of the property and that it will extend the *operations of such school to include classes in swimming and diving at the swimming*

3. The May, 1950, date was supplied by Ord. 50547, approved April 12, 1961.

4. Plaintiffs have cited us to State ex rel. Beacon Court, Inc., v. Wind, Mo.App., 309 S.W.2d 663, from this Court. In that case there was an abundance of evidence that a certain non-conforming use did not exist at the effective date of the ordinance; in the present case there is a total absence of such evidence of non-existence. Hence the reference is not pertinent.

pool located in part A. The emblem of the society publicizes the fact that it conducts a school, "Concordia Turners School of Physical Training". Plaintiffs maintain that the extension of the school's activities to the pool in part A does not involve a permissive use of part A within that part of the use regulations which permits "Schools offering not less than two years of complete courses of instruction equivalent to those given in public primary, secondary and high schools or state universities". There is nothing to indicate that the activities of the defendant in conducting a Concordia Turners School of Physical Training fall within the descriptive permission of Section 904.020(6); in fact the evidence establishes such a limited scope of instruction that no resemblance to the kind of school delineated by that subsection can be found. Hence the conduct of swimming classes on the A zoned area as a part of the Turners' school activities is not sanctioned by 904.020(6). Compare State ex rel. Kaegel v. Holekamp, Mo.App., 151 S.W.2d 685. However we believe that swimming instruction will be readily recognized as a normal and usual concomitant of swimming in a playground pool. Organization of some classes for swimming instruction does not lessen the fact the pool is being utilized for park and playground purposes. The fact that a tuition charge for such instruction is to be made for the children of some classes of members does not detract from that conclusion. Such tuition charges will not make the giving of instruction the carrying on of a business. The pool will remain a private institution. The general public will still have no access to its facilities. We hold that the giving of such swimming instruction even at a tuition charge for the children of some classes of members is a permissive use within the meaning of Section 904.020(9).

Plaintiffs' charge that they have suffered a diminution in the value of their respective properties is without evidentiary support.

Plaintiffs' evidence does show that there has been some abuse of the use of parking in part A. That fact however does not operate to withdraw part A from orderly and reasonably quiet parking. We are not aware that the enactment of a zoning ordinance operates as a repeal of the law of nuisance or that disturbance of the peace is thereby removed from otherwise appropriate police and prosecutor action.

The judgment should be affirmed.

PER CURIAM:

The foregoing opinion by TOWNSEND, C., is adopted as the opinion of this Court. Accordingly, judgment is affirmed.

WOLFE, P. J., and ANDERSON and RUDDY, JJ., concur.